

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-20-00129-CV

———————————————————

ANGIE TAPIA F/K/A ANGIE FLOCKHART, Appellant

V.

COLLINS ASSET GROUP, LLC, AS SUCCESSOR IN INTEREST TO
PRIMELENDING, A PLAINSCAPITAL COMPANY, Appellee

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. 18-3022-431

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

This is a suit on a note. Appellant Angie Tapia appeals the trial court's granting summary judgment in favor of the noteholder, Appellee Collins Asset Group, LLC, and denying her own summary-judgment motion. We will affirm.

### Facts

In 2006, Angie Tapia (then Angie Flockhart) signed a $23,664 promissory note payable to Primelending. The note bore 12.45% interest annually and was executed in connection with Tapia's purchase of residential property in Wyoming, Michigan.[1] The three-page note is a form, bearing the footer "MULTISTATE FIXED RATE NOTE--Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3200 1/01." Other than typewritten additions filling in blanks for such information as the date, property address, amount, names of the borrower and lender, place and time of payments and their amount, and the like, this standard form that Tapia signed is unaltered except in one respect: to the title of section 4, the words "See attached Prepayment Note Addendum" were inserted:

**4. BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

[1]Tapia is a former Michigan resident who now lives in Denton County.

The record does not contain a "Prepayment Note Addendum."

In 2008, the mortgage holder took the property back at a foreclosure sale. The note itself eventually ended up in the hands of Collins Asset Group (CAG), a debt collector. In December 2015, CAG wrote to Tapia advising her that it had purchased the Primelending note in December 2013 and offering to forgo unspecified amounts of accrued delinquent payments—which at a 12.45% interest rate were no doubt substantial—if she would simply start making principal-only payments on a principal balance of $22,359.11 beginning on March 1, 2016.

Getting no response, CAG sent Tapia a notice of intent to accelerate and 30-day right to cure on March 21, 2016.[2] Still hearing nothing, CAG informed Tapia by letter dated April 25, 2016 that the note was accelerated and that she owed the entire accelerated principal balance.

In April 2018, CAG sued Tapia for that balance, pleading a single count titled "Breach of Promissory Note." Tapia answered and raised a statute-of-limitations defense. CAG moved for a traditional summary judgment on its claim and for a no-evidence summary judgment on Tapia's limitations defense; Tapia filed a summary-judgment motion of her own and combined it with a response to CAG's motion and with objections to CAG's evidence.

---

[2]CAG addressed this letter to Tapia in Little Elm, Texas, where she had apparently moved by early 2016.

The trial court overruled Tapia's evidentiary objections, denied her motion, and granted summary judgment for CAG, awarding it $22,359.11 "as the accelerated principal amount due under the contract," $2,000 in attorney's fees, and postjudgment interest at 12.45% compounded annually. After Tapia's new-trial motion was overruled by operation of law, she timely appealed.

## Issues on Appeal

Tapia raises four issues:

- Texas does not recognize a common-law cause of action for breach of a promissory note, which is separate and distinct from a claim under the Uniform Commercial Code (the UCC) for enforcement of a negotiable instrument.

- The promissory note did not meet the definition of a negotiable instrument.

- The trial court erred by granting CAG's no-evidence motion on limitations and by overruling Tapia's objections to CAG's summary-judgment evidence.

- The 12.45% postjudgment interest rate is usurious.

## Standards of Review

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). For a traditional summary judgment, we consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable

4

inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that no evidence supports an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which no evidence exists. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary-judgment evidence that raises a genuine, material fact issue. *See* Tex. R. Civ. P. 166a(i) & 1997 cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

As with a traditional summary judgment, when reviewing a no-evidence summary judgment we examine the record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)); *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

We review a trial court's decision to admit or exclude summary-judgment evidence for an abuse of discretion. *See, e.g.*, *Arce v. Am. Nat'l Ins.*, 633 S.W.3d 228, 232 (Tex. App.—Amarillo 2021, pet. filed); *Marhaba Partners Ltd. P'ship v. Kindron Holdings, LLC*, 457 S.W.3d 208, 213 (Tex. App.—Houston [14th Dist] 2015, pet. denied). We will uphold a trial court's evidentiary ruling if it has any legitimate basis. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

**Discussion**

**A.    For CAG to recover, Tapia's note does not have to be a negotiable instrument under the UCC—although it is.**

In her first two issues, which we discuss together, Tapia contends that Texas does not recognize a common-law cause of action for "breach of promissory note" and that CAG thus had to establish—but did not—that the note is a negotiable instrument under Chapter 3 of Texas's version of the UCC. *See generally* Tex. Bus. & Com. Code Ann. §§ 3.101–.605.

A promissory note does not have to meet the UCC's definition of a negotiable instrument to be enforceable. A suit on a note has four elements: (1) a note exists, (2) the plaintiff is the note's legal owner and holder, (3) the defendant is the maker of the note, and (4) a certain balance is due and owing on the note. *See, e.g.*, *Diversified Fin. Sys., Inc. v. Hill, Heard, O'Neal, Gilstrap & Goetz, P.C.*, 99 S.W.3d 349, 354 (Tex. App.—Fort Worth 2003, no pet.) (listing elements); *Com. Servs. of Perry, Inc. v. Wooldridge*, 968 S.W.2d 560, 564 (Tex. App.—Fort Worth 1998, no pet.) (same).

6

Tapia misreads a case from the Dallas court of appeals for the idea that a party cannot sue on a promissory note unless it is a negotiable instrument, based on this passage:

> The Texas Business and Commerce Code defines a promissory note. It provides that a writing is a negotiable instrument if it (1) is signed by the maker; (2) contains an unconditional promise or order to pay a sum certain; (3) is payable on demand or at a definite time; and (4) is payable to order or to bearer.

*Edlund v. Bounds*, 842 S.W.2d 719, 724 (Tex. App.—Dallas 1992, writ denied) (op. on reh'g) (citing Tex. Bus. & Com. Code Ann. § 3.104(a)). But the *Edlund* court did not hold that an enforceable promissory note *must* be a negotiable instrument,[3] and we ourselves have implicitly rejected that novel idea by pointing out that the effect of nonnegotiability is simply that such notes are governed by contract law rather than by the UCC. *See FFP Mktg. Co. v. Long Lane Master Tr. IV*, 169 S.W.3d 402, 409 (Tex. App.—Fort Worth 2005, no pet.) (holding that because promissory notes at issue were not negotiable instruments, "the [UCC] does not govern their enforcement; contract law does"); *see also Manandhar v. Jamshed*, No. 02-11-00027-CV, 2011 WL 3835980, at *2 & n.5 (Tex. App.—Fort Worth Aug. 31, 2011, no pet.) (mem. op.) (citing *Edlund* to define a note as "a written unconditional promise to pay another a certain sum of money" and interpreting note in question as enforceable-but-

---

[3]Language is not always used precisely. *See, e.g., Great N. Energy, Inc. v. Circle Ridge Prod., Inc.*, 528 S.W.3d 644, 661 (Tex. App.—Texarkana 2017, pet. denied) (explaining that promissory notes are not always negotiable instruments even though often referred to that way).

time-barred nonnegotiable promissory note because it was not payable to bearer or to order, as UCC § 3.104(a) requires for negotiability). One of the biggest practical differences is that a nonnegotiable note has a four-year limitations period, while a negotiable instrument enjoys a six-year period.[4] *Compare* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a), *with* Tex. Bus. & Com. Code Ann. § 3.118(a).

In short, a promissory note is a contract between maker and payee, *e.g.*, *Strickland v. Coleman*, 824 S.W.2d 188, 191–92 (Tex. App.—Houston [1st Dist.] 1991, no writ), and a negotiable promissory note is but a UCC-governed subset of that broader category. Both can be sued upon.

Regardless, Tapia's note is a negotiable instrument, which is "an unconditional promise or order to pay a fixed amount of money" that is payable to bearer or to order when issued, is payable on demand or at a definite time, and "does not state any

---

[4]Tapia's amended answer included the six-year UCC affirmative defense. We suspect that CAG might have inadvertently reinforced Tapia's misunderstanding of the negotiable/nonnegotiable issue when, in responding to Tapia's summary-judgment motion, it agreed that Section 3.118 of the UCC applied. In Tapia's reply to CAG's summary-judgment response, she labeled CAG's agreement as "noteworthy" because Section 3.118 deals with negotiable instruments and "therefore [CAG] admits that its claim is indeed governed by the Texas Business & Commerce Code's Third Chapter dealing with claims on negotiable instruments. Thus, [CAG] should be required to prove that the 'Note' . . . meets all the Chapter 3 requirements of a promissory note." When CAG had moved for summary judgment on Tapia's limitations defense, though, it invoked the four-year residual limitations period, *see* Tex. Civ. Prac. & Rem. Code Ann. § 16.051. Our analysis is unchanged by the fact that, actually, Section 16.004(a)(3)'s four-year period for suing on "debt" applies to suits on nonnegotiable promissory notes. *Id.* § 16.004(a)(3); *Manandhar*, 2011 WL 3835980, at *2.

other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money"; the promise may, however, contain "an undertaking or power to give, maintain, or protect collateral to secure payment" and still be a negotiable instrument. Tex. Bus. & Com. Code Ann. § 3.104(a).

For Section 3.104(a) purposes, a promise to pay is unconditional "unless it states (i) an express condition to payment, (ii) that the promise . . . is subject to or governed by another record, or (iii) that rights or obligations with respect to the promise . . . are stated in another record." *Id.* § 3.106(a). Importantly, "[a] reference to another record does not of itself make the promise . . . conditional," *id.*, nor is a promise made conditional "by a reference to another record for a statement of rights with respect to collateral, prepayment, or acceleration." *Id.* § 3.106(b). Whether a document is a negotiable instrument is a question of law. *See Cartright v. MBank Corpus Christi, N.A.*, 865 S.W.2d 546, 549 (Tex. App.—Corpus Christi 1993, writ denied).

Tapia argues that two provisions in the note make it conditional and thus not a negotiable instrument because they refer to other documents. The first is the typed-in "See attached Prepayment Note Addendum" that appears at section 4. The second is the note's reference to Tapia's mortgage (a "Security Instrument") in section 10, a section that also refers to a possible mortgage-acceleration notice "given in accordance with Section 15."[5] Although we have not found a Texas case addressing

---

[5] As Tapia points out, the note contains only ten subsections, and the "Section 15" reference is to a section in her mortgage.

these exact challenges to the multistate uniform note, other courts have dealt with and rejected similar arguments.

For example, section 4's general requirement that a maker give written notice of any principal prepayment is not a negotiability-destroying "other undertaking" because a maker's ability to prepay a loan is a discretionary benefit, not a burden:

> The right of defendants, under the note, to prepay part of the principal does not constitute an "additional undertaking or instruction" that adversely affects the negotiability of the note. Quite the opposite, the right of prepayment is a voluntary option that defendants may elect to exercise solely at their discretion. Indeed, such an allowance confers a benefit, not a burden, upon defendants, who can freely choose to decline the opportunity.

*In re Walker*, 466 B.R. 271, 283 (Bankr. E.D. Pa. 2012) (rejecting debtor's assertion that obligation to give noteholder notice of principal prepayment made note nonnegotiable, and quoting *HSBC Bank USA, N.A. v. Gouda*, 2010 WL 5128666, at *3 (N.J. Super. App. Div. Dec. 17, 2010) (per curiam), *certification denied*, 17 A.3d 1245 (N.J. 2011)); *see also Brichant v. Wells Fargo Bank, N.A.*, No. 3:12-cv-0285, 2014 WL 11515845, at *4 (M.D. Tenn. Feb. 24, 2014) (collecting cases from other jurisdictions rejecting idea that having to give written notice of principal prepayment is an "additional undertaking"). Because principal prepayment was an option wholly within Tapia's control to exercise, we do not see how any addendum to that option converted her promise to pay the note from an absolute to a conditional one, particularly since the UCC allows "a reference to another record for a statement of rights with respect to . . . prepayment." Tex. Bus. & Com. Code Ann. § 3.106(b).

As for Tapia's second argument, other courts have explained that section 10's security-interest language—which includes the complained-of reference to a "Section 15" within Tapia's mortgage—is "standard in mortgage notes across the country," *OneWest Bank, FSB v. Nunez*, 193 So. 3d 13, 14 (Fla. Dist. Ct. App. 2016), and constitutes "a statement with respect to collateral and acceleration that is specifically permitted by section 3–106(b) of the UCC and does not destroy negotiability," *Mesina v. Citibank, NA*, No. 10-2304 RTL, 2012 WL 2501123, at *2 (Bankr. D.N.J. June 27, 2012) (unpublished letter op.). As has long been the law, "[m]ere reference to a note being secured by a mortgage, of course, is common commercial practice and does not affect the negotiability of the note." *Resol. Tr. Corp. v. 1601 Partners, Ltd.*, 796 F. Supp. 238, 240 (N.D. Tex. 1992) (but holding that incorporation by reference of additional nonmortgage documents' terms into note at issue rendered it nonnegotiable); *see also Cont'l Nat'l Bank of Fort Worth v. Conner*, 214 S.W.2d 928, 931 (Tex. 1948) (holding that mere reference in otherwise negotiable instrument to another agreement will not destroy negotiability unless it appears that the paper is to be burdened by conditions of other agreement).

Thus, in addition to being an enforceable promissory note, Tapia's note is a negotiable instrument under Chapter 3 of the Texas UCC. We overrule Tapia's first and second issues.

**B. Tapia did not present more than a scintilla of evidence on her limitations defense, and CAG's summary-judgment evidence was properly considered.**

Tapia's third issue has two subparts that we will discuss separately.

**1. CAG's no-evidence motion was rightly granted.**

Tapia interposed a six-year limitations defense in her answer. *See* Tex. Bus. & Com. Code Ann. § 3.118 (providing six-year enforcement period from negotiable instrument's specified due date or from date of acceleration). In response to CAG's no-evidence summary-judgment motion on that defense, Tapia submitted her and her now-husband's affidavits in an effort to suggest that her note had been accelerated in 2008, thus triggering the running of limitations, long before CAG acquired the note, accelerated it in 2016, and sued her in 2018.

If a note secured by real property contains an optional acceleration clause, limitations does not automatically start to run upon default; an action accrues "only when the holder actually exercises its option to accelerate" the entire note. *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex. 2001). Because acceleration is a harsh remedy, effective acceleration requires two notices, both of which must be "clear and unequivocal": (1) a notice of intent to accelerate and (2) a notice of acceleration. *Id.* (quoting *Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 892 (Tex. 1991)); *see also Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 234 (Tex. 1982) (explaining two types of notice). So fastidious is the law in requiring clear and unequivocal language that something as seemingly minor as telling a defaulting maker

that the noteholder "may" accelerate does not constitute a formal notice of intent to accelerate. *Ogden*, 640 S.W.2d at 233–34.

Here, it is undisputed that CAG followed the necessary steps to accelerate the note. To raise a fact issue that some other person or entity had accelerated the note back in 2008—thus starting the limitations period—Tapia had to come up with more than she and her husband did. Not only were no documents attached to their affidavits that suggested an earlier acceleration, Tapia said only that in 2008, after the property was foreclosed on, she "received a bill demanding that [she] pay the full balance due on the account"; she "received several letters from debt collectors in this time frame telling [her] that the entire balance was due, but that they would settle for various reduced amounts"; and that in March 2009, she "received another bill demanding that the mortgage be paid in full from a different debt collector," after which the communications petered out between 2009 and when CAG contacted her in 2015. Tapia stated her "understanding and belief" based on those earlier communications that "in 2008 the mortgage was accelerated and the owner of the mortgage was demanding payment in full of the account." She also stated that she had "never been told by a lender that they had decided not to pursue the full balance of the note after it was accelerated in 2008." Tapia's husband averred that before their 2010 marriage, he had lived with Tapia at her parents' house in Grand Rapids from 2008 to 2009; that during that time, Tapia received mail at her parents' house that

13

"included bills" and "bills for her house" in Wyoming; and that "[t]he bills were asking that [Tapia] pay for the mortgage due on the [Wyoming] house."

None of these averments raises a fact issue that Tapia's note had been accelerated—a technical and exacting process—more than six (or four) years before CAG sued her in 2018. At most, Tapia established that debt collectors were contacting her for at least partial payment, as CAG itself did in December 2015 before later giving Tapia notice of its intent to accelerate and of its eventual acceleration after she failed to respond. Other than that, Tapia's affidavit statements concerning acceleration were conclusory and thus insufficient to raise a fact issue. *See, e.g.*, *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (noting that conclusory affidavits are not enough to raise fact issues; they are "not credible, nor susceptible to being readily controverted"); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) (holding legal conclusions in defendant's affidavit insufficient to raise fact issue on affirmative defense); *Trinity River Ests., L.P. v. DiFonzo*, No. 2-08-393-CV, 2009 WL 1506928, at *4 (Tex. App.—Fort Worth May 28, 2009, no pet.) (mem. op.) (affirming no-evidence summary judgment where nonmovant's affidavit on damages contained no basis for opinion).

## 2. The trial court did not abuse its discretion in overruling Tapia's evidentiary objections.

Tapia also argues that CAG's summary-judgment evidence was defective and that the trial court should have sustained her three objections, which were that

- the statements in CAG's business-records affidavit concerning the balance due were inadmissible hearsay;

- CAG's three letters to Tapia, attached as exhibits to the business-records affidavit, were inadmissible hearsay without an exception under Texas Rule of Evidence 803(6); and

- those same three letters were inadmissible as not the best evidence of the balance due.

These objections all went only to the amount CAG claimed as the principal balance due.

We are unpersuaded that the trial court abused its discretion in overruling Tapia's objections. A noteholder "need not file detailed proof reflecting the calculations reflecting the balance due on a note; an affidavit by a bank employee which sets forth the total balance due on a note is sufficient" to affirm summary judgment. *Hudspeth v. Inv. Collection Servs. Ltd. P'ship*, 985 S.W.2d 477, 479 (Tex. App.—San Antonio 1998, no pet.) (citing *Martin v. First Republic Bank, Fort Worth, N.S.*, 799 S.W.2d 482, 485 (Tex. App.—Fort Worth 1990, writ denied)). "Courts have upheld summary judgments based on affidavits that simply identified a promissory note and a lump sum figure as the principal balance and interest due and owing by the nonmovant on that note."[6] *Id.* (citing *Thompson v. Chrysler First Bus. Credit Corp.*, 840 S.W.2d 25, 28–29 (Tex. App.—Dallas 1992, no writ); *Gen. Specialties, Inc. v. Charter Nat'l Bank–Hous.*, 687 S.W.2d 772, 774 (Tex. App.—Houston [14th Dist.]

---

[6]CAG did not sue for accrued interest.

1985, no writ); Timothy Patton, *Summary Judgment in Texas: Practice, Procedure and Review* § 9.06[2][e] (2d ed. 1996)). We have more recently recognized the same thing. *See FFP Mktg.*, 169 S.W.3d at 411 ("Generally, an affidavit that sets forth the total balance due on a note is sufficient to sustain an award of summary judgment. Detailed proof of the balance is not required.").

Additionally, because CAG's summary-judgment evidence was clear, positive, and direct about the principal amount owed, Tapia bore the burden "to point out any inaccuracy in computation or, by proper response, to point out reasons for [her] inability to do so." *Sharpe v. Lomas & Nettleton Fin. Corp.*, 601 S.W.2d 55, 57 (Tex. App.—Dallas 1980, writ ref'd n.r.e.); *see also Sandhu v. Pinglia Invs. of Tex., L.L.C.*, No. 14-08-00184-CV, 2009 WL 1795032, at *5 (Tex. App.—Houston [14th Dist.] June 25, 2009, pet. denied) (mem. op.) ("Moreover, Sandhu has not presented any controverting evidence raising a fact issue as to Pinglia Investments's method of computation and the accuracy of its figures.").

We overrule Tapia's third issue.

## C. The 12.45% postjudgment-interest rate accords with the Finance Code.

In her fourth and final issue, Tapia argues that CAG's December 2015 letter effectively overrode the Texas Finance Code's judgment-interest provisions, making

the trial court's award of postjudgment interest at the note's 12.45% rate—instead of

5%—erroneous.[7] *See* Tex. Fin. Code Ann. §§ 304.002, .003. We disagree.

When CAG informed Tapia in December 2015 that it had purchased her note

and offered her a schedule of principal-only payments, it explained what could happen

if she failed to make those monthly principal payments:

> CAG retains the right to seek payment of future accrued interest on any unpaid principal, such accrual of interest commencing according to law at a per annum interest rate which is the lower of 1) the contractual rate of interest contained within the promissory note; or 2) any applicable general statutory rate of interest as allowed by law.

Tapia would have us read "any applicable general statutory rate of interest as allowed

by law" as pointing to Section 304.003 of the Finance Code. *See* Tex. Fin. Code Ann.

§ 304.003 (providing that in the absence of a contractual interest rate, judgments earn

interest at a rate between 5 and 15%, depending on the Federal Reserve System's

prime rate on the date interest is computed).[8]

But Section 304.002 provides that the judgment-interest rate is the lesser of

whatever rate the parties contracted for or 18%. *See id.* § 304.002. Tapia's

contention—that CAG's letter's reference to "*any* applicable" statutory interest rate

_____

[7]Tapia's argument does not match her issue, which asked, "Is the 12.45% post-judgment interest rate ordered by the Court usury?" In the body of her brief, however, Tapia does not discuss any legal principles or caselaw relating to usury. We will address this issue as Tapia substantively argued it.

[8]In February 2020, when the trial court entered judgment, the prime rate was 4.75%; thus, under Section 304.003, the rate would have been 5%.

effectively means that she gets to choose between Sections 304.002 and 304.003 to find the more favorable rate—ignores the word "applicable." Because Tapia had contracted for a 12.45% interest rate, the applicable statutory rate is the one in Section 304.002: the lesser of 12.45% or 18%. Section 304.003, which, if it applied, would indeed reduce the postjudgment interest rate to 5%, comes into play only if "Section 304.002 does not apply." *Id.* § 304.003(a).

We overrule Tapia's fourth issue.

## Conclusion

Having overruled each of Tapia's issues, we affirm the trial court's judgment.


/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  February 3, 2022